Doton
*v.*
Russell.

### Doton and others *against* Russell.

Payment of the mortgage debt, by the mortgagor, after the law day has expired, without getting in the legal title, will not enable him, or any one claiming title under him, to sustain an action at law against the mortgagee for the possession.

[*Points discussed, but not directly decided.* Levy of execution on mortgaged premises. . . . Extinguishment of mortgage debt. . . . Merger of equitable and legal estates.]

THIS was an action of ejectment; tried at *Litchfield, February* term 1845, before *Hinman,* J.

On the 8th of *July* 1835, *Polly Dutcher*, in consideration of love, good will and affection, executed a warranty deed of all her real estate, including the demanded premises, to her daughters, *Maria Gifford*, wife of *Samuel Gifford*, and *Eliza D. Stanton*, wife of *Joshua W. Stanton*. On the 1st of *September* 1837, *Stanton* and his wife, by a quit-claim deed, mortgaged their interest in this estate, *viz.* the undivided moiety thereof, to *Samuel Gifford*, to secure a debt of 300 dollars, payable on demand; and on the 20th of *July* 1838, they mortgaged, by a warranty deed, the same property, to *Gilbert Monson*, to secure the payment of a note for 550 dollars, payable also on demand. On the 20th of *September* 1838, *Stanton* purchased of *Maria Gifford* her interest in the premises, for 1570 dollars, and took from her a quit-claim deed thereof; and on the same day, *Stanton* mortgaged back the same property to *Maria Gifford*, to secure the payment of the purchase money.

It was admitted, that the debts to secure which said mortgages were given, were due and outstanding, at the time of the plaintiffs' levy herein after-mentioned, unless they were extinguished, by the transactions about to be stated.

On the 10th of *October* 1840, *Stanton*, as principal, and *Eliphalet Whittlesey*, as his surety, on the one part, and *William P. Russell*, the present defendant, as principal, and *John Russell*, as his surety, on the other part, entered into an agreement, by indenture, by which *Stanton* covenanted to sell to *William P. Russell*, a farm of land formerly owned by *Polly Dutcher*, and by her conveyed to her daughters, *Maria Gifford* and *Eliza D. Stanton*, at a valuation to be made by cer-

*Litchfield,*
June, 1845.

Doton
*v.*
Russell.

tain appraisers, and on the 1st day of *April* following, to execute and deliver to said *W. P. Russell* a deed conveying a perfect title to the premises, with full assurance that every part thereof was free of incumbrance ; and *W. P. Russell*, on his part, covenanted to pay to *Stanton*, on said 1st of *April*, the amount of the appraisal, deducting a certain claim of his against the estate of *Polly Dutcher*, then not precisely ascertained. On the 27th of *January* 1841, the premises were appraised, by the appraisers designated, at 3475 dollars. On the 31st of *March* 1841, *Stanton* and his wife, with *Maria Gifford* and *Monson*, entered into a written agreement with *Whittlesey*, by which it was stipulated, that he should sell and dispose of said property in such way as he might judge expedient, and from the avails, together with such assets as he might have in his hands belonging to the estate of *Polly Dutcher*, should pay the claims which had been and should be allowed against her estate, and the expenses of settlement ; and of the residue, if any, he should first pay to *Maria Gifford* and *Monson*, in proportion to the sums that should then be due on their respective mortgages, and should then apply the residue, if any, to the payment of the plaintiffs' debt, for which they had attached the premises. For the purpose of enabling *Whittlesey* to carry this arrangement into effect, the other parties thereto, on the same day, executed a quit-claim deed of the premises to him. In pursuance of the same arrangement, *Whittlesey* immediately sold said property to the defendant, at the price of 3475 dollars, and gave him a bond, the condition of which was, that the obligor should, on or before the 1st day of *April* 1842, execute and deliver to the defendant a deed of warranty, conveying to him a good and perfect title to the premises, with full assurance that every part thereof was free from any incumbrance whatsoever. *Whittlesey* then paid to *Monson* 639 dollars, and, a day or two afterwards, to *Maria Gifford* 820 dollars, to be applied on their respective notes against *Stanton* ; of which sums they engaged to repay so much as should be wanted to pay claims against the estate of *Polly Dutcher* and expenses of settlement, and so much as should be necessary to carry into full effect the above-mentioned agreement of the 31st of *March* 1841. The defendant went into possession of the

premises, and was in possession thereof, when the present action of ejectment was brought.

On the 14th of *March* 1841, the plaintiffs attached the demanded premises, as the property of *Stanton,* in an action against him, in which they recovered judgment, at the term of the *Litchfield* county court, in *December* 1841, for 214 dollars, 37 cents, damages and costs. An execution issued on this judgment, was levied, in the words of the return, " on a certain piece of land, whereof the said debtor [*Stanton*] was seised and possessed in fee, that is, an undivided half of said piece of land, in his own right, and the use and improvement of the remaining half, during the life of said debtor ; said piece of land being situated" &c. [describing it by metes and bounds.] The debtor's interest in said land was appraised at 155 dollars ; and the officer, on the 18th of *April* 1842, set off to the plaintiffs " the whole of the undivided half of said piece of land, and all the right, title and interest, which said *Stanton* then had, or ought to have, or did have, at the time said land was attached on the original writ in favour of said *Doton, Mansfield & Co.* [the present plaintiffs,] against said *Stanton,* in part satisfaction of said execution."

The plaintiffs introduced the depositions of *Maria Gifford* and *Gilbert Monson* ; and the defendant introduced another deposition of Mrs. *Gifford.* Mrs. *G.* in her first deposition, confirmed the facts already stated from documents exhibited on the trial, with some additional remarks. Regarding the arrangement of the 31st of *March* 1841, she said, that said estate was conveyed to said *Whittlesey* for the purpose of disposing of it to satisfy the debts of *Polly Dutcher* and *J. W. Stanton* ; but that the mortgage should still remain on the estate until it should be sold, and the claims satisfied : that she had never received any payment on the above-mentioned notes, previous to this transaction, and had possession of them until *October* 1841, when she delivered them to *David B. Stanton,* and has written to him to deliver them to said *Whittlesey,* and has had no knowledge of them since that time : that she came in possession of *Stanton's* note for 300 dollars, to *Samuel Gifford,* by being his widow. In her second deposition, she testified, that her husband died on the 18th of *May* 1838, and she became administratrix of his estate, and said note for 300 dollars came into her hands as such

administratrix: that said *Whittlesey* paid to her 820 dollars, of which she loaned 300 dollars to take up said note for 300 dollars, and he gave her, as security therefor, a new note for that sum, with a mortgage on lands in *Ohio*: that she considered that the first-mentioned 300 dollars was paid by this operation, but she did not give up the note: that in *April* 1841, said *Whittlesey* paid her the sum of 820 dollars: that nothing was said as to the application of said money, but by the arrangement with *Stanton* about the note for 300 dollars, she considered the whole 820 dollars applied on the note for 1570 dollars, secured by mortgage, which *Stanton* had given her, for her half of said real estate: and that this is all that she has received on said estate.

*Monson* testified, that according to the best of his recollection, he received the full amount of *Stanton's* note to him, when he released his interest in said real estate: that at the time of receiving his money for the note, he considered it as cancelled and fully satisfied, and should have given it up, at that time, had he been called upon so to do: that his impression also was, that all the mortgages on said real estate were fully satisfied and discharged; and that, so far as they were concerned, the whole matter was then settled and ended.

On these facts, as shown by the documents and testimony exhibited on the trial, the plaintiffs claimed, that the court ought to instruct the jury, that if they believed the depositions offered by them, they ought to find, that the mortgages were extinguished, and that the plaintiffs were entitled to recover; and that the question was a question of fact, which ought to be submitted to the jury.

The defendant claimed, that the matter in controversy was a question of law; and that the court, on the facts admitted, ought to direct the jury to find a verdict in his favour.

The court charged the jury as follows: " The whole matter depends upon the operation of the deed to *Whittlesey* of the 31st of *March* 1841. If that operates to extinguish the mortgages, then, at the time of the levy, the plaintiffs had right to levy, in the manner they did, by metes and bounds. It does operate to extinguish the mortgages, unless the intent of the parties was otherwise. *Stanton's* joining in that conveyance had no effect against the plaintiffs, because the land had been previously attached. What then was the intent of

the parties to that conveyance? Was there any intent or object in its not extinguishing the mortgages? The mortgagees say, in their depositions, it was not their object to sell or assign their mortgages, or to keep them alive in any way. Was there any just reason why they should be kept alive? *Whittlesey* had joined with *Stanton* in a bond to convey the land to *Russell.* He was thus interested to cause that contract to be fulfilled; and to enable him to give *Russell* a title, his intent was, to get up the mortgages. If then the mortgagees have told the truth in their depositions, and if you are satisfied, that the intent of *Whittlesey* was, to get in the mortgage title, so that he might be enabled to fulfil his bond to convey to *Russell,* and by that means, save himself harmless from the contract of *Stanton* to convey to *Russell,* which contract he had executed as surety for *Stanton,* this would justify the jury, in finding, that the intent to get in the mortgages was, to enable *Whittlesey* to fulfil the first contract of *October* 10th, 1840, and also his own bond to *Russell;* and if such was the intent, then the deed of the 31st of *March,* 1841, operates to extinguish the mortgage titles, and of course, left the property liable to be levied upon, and set off by metes and bounds, as the property of *Stanton;* and the plaintiffs have acquired a good title, by their levy, and are entitled to recover. I think too, that the mere operation of the deed of the 31st of *March* 1841, in connexion with the facts sworn to in the depositions of *Mrs. Gifford* and *G. Monson,* is, to extinguish the mortgage lien, unless there is shown to have been a different intent."

The jury returned a verdict for the plaintiffs; and the defendant moved for a new trial for a misdirection.

*Church* and *Hubbard,* in support of the motion, contended, 1. That the plaintiffs had acquired no legal title, by the levy of their execution. In the first place, *Stanton* had, at most, but an equitable interest, when the plaintiffs' attachment was served, or when their execution was levied. The mortgage debts had never been paid or extinguished. No part of the money paid by *Whittlesey* was to be applied on the mortgages, until the estate of *Polly Dutcher* was settled, and it should be ascertained whether it would be required for the purposes of that estate. At the time of the levy,

that event had not arrived. Secondly, *Stanton* having conveyed all his interest in the premises to *Whittlesey,* on the 31st of *March* 1841, and the plaintiffs having made their levy on the 17th of *April,* 1842, they could take only the then existing interest of *Stanton,* of which nothing remained; and of course, they took nothing by their levy. Thirdly, the levy was void, because it was made upon the *land,* which was appraised as such, and set off by *metes and bounds.*

2. That here was no merger of the equitable estate in the legal. The doctrine of merger is applicable, principally, to *legal* estates; and even with regard to them, there is no merger, if justice and general convenience require the lesser and greater title to be kept distinct. But in chancery, mergers are still less favoured. It is there, commonly a mere question of *intention,* express or implied, of the person in whom the estates unite; and the equitable estate will be kept on foot, unless such intention requires it to be merged. Wherever it is for the *interest* of such person that the equitable estate should be kept on foot, it will be; such being his presumed intention. So if there be any other *good reason* for keeping the estates separate, they will be so kept. *Lockwood* v. *Sturdevant,* 6 *Conn. R.* 383, 4. *Baldwin* v. *Norton,* 2 *Conn. R.* 161. *James* v. *Morey,* 2 *Cowen* 246.

3. That the plaintiffs, if they are entitled to any relief, must seek it in a court of chancery, and cannot sustain an action of ejectment. If the mortgage debts were paid before the levy, yet being after the law-day, the legal title did not revest in the mortgagor. *Smith* v. *Vincent,* 15 *Conn. R.* 1.

*Seymour* and *Averill,* contra, insisted, 1. That the defendant had nothing to complain of, in regard to the question of merger. The court left it to the jury to find the *intent* of the parties to the deed of *March* 31st, 1841. This was a fact within the province of the jury to find; and by their verdict, they have found it in favour of the plaintiffs. Upon such fact, thus found, the equitable estate is merged in the legal— the mortgages are extinguished. 2 *Bla. Com.* 177. *Gibson* v. *Crehore,* 3 *Pick.* 475. 482. *Lockwood* v. *Sturdevant,* 6 *Conn. R.* 390. *James* v. *Johnson,* 6 *Johns. Ch. R.* 423. *Starr* v. *Ellis, Id.* 393. *Gardner* v. *Astor,* 3 *Johns. Ch. R.*

*Litchfield,*
June, 1845.

Doton
*v.*
Russell.

53. Lord *Compton* v. *Oxenden*, 2 *Ves. jr.* 261.   *Forbes* v. *Moffatt*, 18 *Ves.* 384.   4 *Kent's Com.* 99. & seq.

2. That the execution was properly levied.   *Mitchell* v. *Kirtland*, 7 *Conn. R.* 229.   *Booth* v. *Booth*, Id. 350.   *Spencer* v. *Champion*, 13 *Conn. R.* 11.   *Peck* v. *Wallace*, 9 *Conn. R.* 453.   *Whittlesey* v. *Starr*, 8 *Conn. R.* 134.   1 *Sw. Dig.* 795.   [One or two other points were discussed, which the decision has rendered it unnecessary to state.]

WAITE, J.   From the facts detailed in the motion, and the documents annexed, it appears, that, on the 8th day of *July* 1835, *Polly Dutcher*, being the owner of the demanded premises, conveyed them, by deed, to her two daughters, *Maria Gifford*, wife of *Samuel Gifford*, and *Eliza D. Stanton*, wife of *Joshua W. Stanton*.   In *September* 1837, *Stanton* and wife mortgaged their interest to *Samuel Gifford*, by means of a quit-claim deed ; and in *July* 1838, by a warranty deed, gave another mortgage of their interest to *Gilbert Monson*.   In the month of *September* following, *Stanton* purchased of *Maria Gifford* her interest in the premises, and he and his wife joined in a mortgage of the premises to her, to secure the payment of the purchase money.

On the 4th day of *March* 1841, after all the mortgage deeds, executed by *Stanton* and wife, had become absolute, and when all the debts remained outstanding, the plaintiffs brought an action against *Stanton*, and attached the demanded premises, as his property.   They afterwards obtained judgment in their suit, and caused their execution, in the month of *April* 1842, to be levied upon the premises.

The first enquiry, naturally arising in the case, is, what title the plaintiffs acquired, by the levy of their execution, provided no change had taken place in the titles of the mortgagors and mortgagees, subsequent to the attachment.   *Stanton* then had but an equity of redemption ; the deeds having become absolute, and the legal title vested in the mortgagees. The plaintiffs, under such circumstances, could not have sustained an action at law to recover possession of the property. They took nothing more by the execution than *Stanton* had in the property, which was but an equitable title.   Before they could have sustained their action of ejectment, it would have been necessary for them to get in the legal title, out-

standing in the mortgagees, either by the aid of a court of chancery, or in some other manner. This principle is well settled in this state. *Smith* v. *Vincent* & al. 15 *Conn. R.* 1.

It however further appears, that on the 31st day of *March,* 1841, after the attachment by the plaintiffs, and before the levy of their execution, *Stanton,* his wife, *Monson,* and *Maria Gifford,* executed a release deed of the premises to *Eliphalet Whittlesey.* This was done for the purpose of enabling him to convey the same to the defendant, in pursuance of a contract, previously made with him, by *Stanton,* his wife, and *Whittlesey,* for the sale of the premises to the defendant. On the same day, *Whittlesey* gave the defendant a bond, obligating himself to convey to him the premises. In the condition of that bond, there was a stipulation that possession of the premises should be immediately given to the defendant; and possession was accordingly taken under it.

It also appears, that in *May,* 1838, *Samuel Gifford* died, and that his wife became the administratrix of his estate. What became of the legal title, which had vested in him, by virtue of the mortgage from *Stanton* and wife—whether it remained in his heirs at law, or had been released by the administratrix—does not very distinctly appear. There is no evidence showing that it has ever been conveyed to the plaintiffs. So far as the property is covered by that mortgage, the plaintiffs show no legal title.

How are their rights affected, by the release deed to *Whittlesey?* By that instrument, the legal title of the mortgagees, and the equitable title of the mortgagors, subject to the lien acquired by the attachment, became vested in him. The lien remained unimpaired by that conveyance. *Stanton* never having had the legal title, either at the time of the attachment, or at any subsequent period, the plaintiffs could acquire none from him, by virtue of their levy; and it is not pretended, that they ever acquired it in any other manner.

It is said, however, that the mortgage debts were paid by *Whittlesey,* at the time of the conveyance to him. Suppose the moneys paid by *Whittlesey,* operated as payment of the debts, and not as a purchase; how would that vary the title of the plaintiffs, so long as there is no conveyance of the legal title, either to *Stanton* or to the plaintiffs? The payment by *Whittlesey* can have no greater effect than it would

*Litchfield,*
June, 1815.

Doton
*v.*
Russell.

have, had it been made by *Stanton* himself.    Now, it is well settled, in this state, that if the mortgagor pays the debt after the law day has expired, he cannot sustain an action at law against the mortgagee for the possession, nor can any one claiming title under him.    He must first get in the legal title. *Smith* v. *Vincent* & al. before referred to.    The plaintiffs having taken nothing more than *Stanton's* interest, can place themselves in no better situation than he was.    The defendant, by virtue of the deeds from the mortgagees to *Whittlesey,* and the authority given to him by *Whittlesey,* is entitled to stand in the same situation as the mortgagees.

This view of the case, upon the facts as presented to us, disposes of the present action, and renders an examination of the other questions involved unnecessary.    The court therefore are of opinion, that a new trial must be granted.

In this opinion the other Judges concurred, except STORRS, J., who was absent.

New trial to be granted.